## MAINE CENTRAL RAILROAD COMPANY

*vs.*

## NATIONAL SURETY COMPANY.

Cumberland.      Opinion July 21, 1915.

*Alteration.  Bond.  Contract.  Contractor.  Damages.  Insolvency. Possession.  Surety.  Waiver.*

1.  The principle is elementary that any material alteration in the terms of a contract for the performance of which a surety is bound, if made without the surety's consent, releases him from liability.

2.  It is also an established rule that a surety for the faithful performance of a building contract is entitled to have the consideration for the contractor's performance of his undertakings retained by the creditor in accordance with the terms of the contract.

3.  The great weight of authority is to the effect that if the creditor in such a contract makes advance payments to the contractor, in violation of the terms of the contract, without the surety's consent, such payments operate to release the surety to some extent.

4.  An advancement of money by an owner to his contractor before a payment becomes due under a building contract does not necessarily operate as an alteration of the contract itself; that depends upon the amount of the payment and the conditions and circumstances under which it was made, considered in connection with the rights and obligations of the surety under his contract of suretyship.

5.  In the case at bar, the advance payments made by plaintiff to the contractor, under the circumstances and conditions disclosed, did not constitute an alteration of the contract so as to release the surety from all liability.

6.  To the extent of the advance payment of five thousand dollars the surety is released, and is not to be charged with that as a part of the cost of the work.

7.  Where in an action for a breach of a contract the plaintiff has recovered a judgment, that judgment is presumed to include all the damages he sustained by reason of the breach.  In such an action the plaintiff is not permitted, without the defendant's consent, to withdraw a part of his alleged damages and reserve that as the subject of another action.

8.  The liability of a surety cannot exceed that of his principal.  And where a contractee has brought an action against his contractor for damages on account of a breach of the contract, that judgment fixes the amount of the damages for the breach so far as the plaintiff is concerned; and in a subsequent action by the same plaintiff against the surety for the contractor the plaintiff cannot recover more damages for the breach than the amount of his judgment against the contractor.

9.  The plaintiff having taken possession of the contractor's plant and other property in the exercise of its right under the contract to take and hold the same as security for any damage it might sustain by reason of a breach of the contract, must be regarded as holding the property so taken for the benefit of the surety as well as itself.

On report.  The cases are remanded to nisi prius to be disposed of in accordance with the stipulation and this opinion.

Two actions against defendant as surety in the bonds given by a contractor to secure the performance of his contracts with the plaintiff for construction work.  They are reported to the Law Court on an agreed statement of facts and are to be argued together.

The cases are stated in the opinion.

*Symonds, Snow, Cook & Hutchinson,* for plaintiff.

*Hinckley & Hinckley,* for defendant.

SITTING:  SPEAR, CORNISH, KING, BIRD, HANSON, PHILBROOK, JJ.

KING, J.  These actions are against the defendant as surety in the bonds given by a contractor to secure his contracts for construction work.  They are reported on an agreed statement.

June 16, 1909, William J. McHale entered into two contracts with the plaintiff, one for the construction of masonry work, and the other for the doing of grading and formation work, in revising the line and

grade and double tracking a portion of the plaintiff's railroad.   The defendant became the surety in each bond given by McHale to secure his performance of the respective contracts.   Each bond contained the following condition:   "The condition of this obligation is that if the party designated as contractor in the foregoing contract shall faithfully furnish, and do everything required therein of said party, this obligation shall become of no effect, otherwise shall continue in full force."   They contained no other provisions.

The masonry work was to be completed by November 1, 1909, and the other work by November 16, 1909.   The following is the provision for payment in the grading contract:   "And the Company agrees to pay the Contractor at the rates aforesaid, monthly, on or about the fifteenth of each month, for all work done and materials furnished and delivered on the work, up to and including the last day of the preceding month, certified to by the Company's Chief Engineer to be in accordance with this contract, less fifteen per centum of such amount, which percentage shall be withheld by the company until the final completion and acceptance of the work, under the terms and agreements of this contract, when the percentage so retained together with the balance due on the Final Estimate, shall be paid by the Company upon the certificate of the Company's Chief Engineer that the whole work provided for in this contract is completed and acceptably finished within the time specified."   The provision for payment in the masonry contract was to the same effect, providing for the payment on or about the fifteenth of each month "of eighty-five per cent (85%) of the value of the work done and materials furnished in their final position in the work during the preceding month, as shown by estimate of the Chief Engineer of the said Railroad."

In each contract it was provided that in case the contractor made default in any of his undertakings, or failed to carry on the work with such efficiency as to insure its completion within the time provided, the Company could take over the work and complete it at the contractor's expense; and in the grading contract it was provided that the Company could take possession of the said work, or any part thereof, "with the tools, materials, plant, appliances, houses, machinery, and other appurtenances thereon, and hold the same as security for any or all damages or liabilities that may arise by reason of the nonfulfilment of the Contract within the time herein stipulated, and furthermore, may employ the said tools and other appurten-

ances, and such other means as said Company may deem proper to complete the work at the expense of the Contractor, and may deduct the costs of same from any payments then due or thereafter falling due to the contractor; and in case the contractor shall not complete the said work within the time herein specified, and the Company shall, notwithstanding such failure, permit the contractor to proceed with and complete the said work as if such time had not elapsed, such permission shall not be deemed a waiver in any respect by the Company of any forfeiture or liability for damages or expenses arising from such non-completion of said work within the time specified, but such liability shall still continue in full force against the Contractor as if such permission had not been granted. And it is further distinctly understood and agreed that "time" whenever mentioned in this Agreement, is of the essence of this Agreement."

Mr. McHale, the contractor, died September 3, 1909, while the work was in progress. Previous to his death, on August 25, 1909, an advance payment of $5000 was made to him by the plaintiff without the knowledge of the surety. This payment was not due under the terms of the contracts until September 15, 1909. On the date when the payment was made no estimate of the work was made by the engineer, but, according to the agreed statement, "it was believed that the work done was in excess of this amount and the August estimate for the work done for that month showed this to be the fact." As the work progressed, other advance payments were made to subcontractors before they were due, but only after estimates had been made showing that the amount of work done was in excess of the advance payments.

Administration on the estate of Mr. McHale was taken out in Penobscot County, Maine, and his widow, Evelyn F. McHale was appointed administratrix thereof, and she undertook to complete said contracts. On September 30, 1909, after previous notice to her as provided for in the contract, the plaintiff notified her "that the Maine Central Railroad Company does hereby take possession of the said work with the tools, materials, plant, appliances, houses, machinery and other appurtenances thereon, and hold the same as security for any and all damages or liabilities that may arise by reason of the nonfulfilment of said contract, and will employ said tools and other appliances as it may be deemed proper to complete the work at your expense and will deduct the cost of the same from

any payments now due or hereafter falling due to you." On November 16, 1909, the plaintiff notified the defendant that the work had not been completed in accordance with the terms of either contract and demanded damages to the full penalty of the bonds. Prior to November 16, 1909, the defendant had no knowledge of Mr. McHale's death, or of the failure of either the contractor or the administratrix to perform the contracts according to their terms. The plaintiff completed the work provided for in each contract, that under the masonry contract at a profit of $832.51, and that under the other contract at a loss of $6,782.44; but the work was not completed within the time specified in either contract, and it is not shown at what time it was finished.

In August, 1910, the estate of Mr. McHale was represented insolvent and the plaintiff was named as a creditor to the amount of $6,840. In the warrant to the commissioners, however, it was not named as a creditor, and in March, 1911, it petitioned the Probate Court for an extension of time to file its claim, which was granted and an additional warrant was issued to commissioners in which the plaintiff was named as a creditor to the amount of $22,070.13. Its claim was disallowed by the Commissioners, whereupon an appeal was taken to the Supreme Judicial Court and an action was brought thereunder by the plaintiff claiming therein to recover $6,782.44, its direct loss under the grading contract, and $16,120 as consequential damages resulting to it from the failure of the contractor to complete the work under the contracts within the times provided therefor, less the $832.51 profit on the masonry contract, leaving a balance as claimed of $22,070.13. The plaintiff also filed in Penobscot County, Maine, a bill in equity against the administratrix. The administratrix, on the other hand, brought against the plaintiff an action of trover in the County of Suffolk, Massachusetts, to recover the value of the plant and other property which the plaintiff had taken possession of as above stated, and she also brought another action against it under the contracts. Subsequently a compromise was made between the plaintiff and the estate of McHale by which the administratrix was to have judgment for $7,299.50 and costs in her action of trover, judgment was to be entered for the defendant without costs in her other action against the plaintiff, the bill in equity was to be dismissed without costs, and the plaintiff was to take judgment for $5950.13 in its suit pending in Maine on its claim against the estate. That com-

promise was carried out. The plaintiff paid the administratrix the said sum of $7299.50 and costs and retained possession of the plant. In the action pending in Maine on the plaintiff's claim the auditor, therein previously appointed, in accordance with the compromise agreement and by consent, reported that the amount due the plaintiff was $5950.13, whereupon judgment was rendered by said court for that amount and a certificate of the judgment was filed in the Probate Court. In his report the auditor states, "The question of consequential damages was not considered by me." It is stated in the agreed statement that "Owing to the fact that the contracts were not completed within the specified time, the Maine Central Railroad Company was compelled to continue to operate its trains over the old grade at Damascus between Etna and Hermon Pond, and in so doing incurred an additional operating cost, which cost is claimed in these cases as consequential damages."

It is stipulated that if the court shall find that the defendant is liable the cases shall be referred to an auditor to ascertain and report the amount of damages according to such rules as the Law Court shall determine.

1. The defendant complains that it was not notified by the plaintiff as to the progress of the work in the contractor's lifetime, or of his death and what was done thereafter in respect to the completion of the work. But there was no provision in the contract of suretyship for any such notice. In the absence of such provision there was no duty on the plaintiff to keep the surety constantly informed as to the state of the work under the contracts. In such case the surety must protect his own interest to the extent of ascertaining that his principal is performing his duty under the contract which he has guaranteed. *Wakefield* v. *American Surety Co.*, 209 Mass., 173, 177. *Watertown Fire Ins. Co.* v. *Simmons*, 131 Mass., 85.

2. It is claimed in behalf of the defendant that it was released from all liability as surety on the bonds in suit by reason of the payments made by the plaintiff to the contractor in advance of the time they would have become due under the terms of the contracts, and without its consent.

The principle is elementary that any material alteration in the terms of a contract for the performance of which a surety is bound, if made without the surety's consent, releases him from liability. It is also an established rule that a surety for the faithful performance of

a building contract is entitled to have the consideration for the contractor's performance of his undertakings retained by the creditor in accordance with the terms of the contract, for the reason that it affords protection to the surety against possible defaults of his principal, and also serves as an incentive to the contractor to promptly and faithfully perform his undertakings which the surety has guaranteed. And undoubtedly the great weight of authority is to the effect, that if the creditor in such a contract makes advance payments to the contractor in violation of the terms of the contract, without the surety's consent, the making of such payments operates to release the surety to some extent at least. But the authorities do not agree on the question, whether the surety will be released from all liability under a building contract, which provides for payments by installments to the contractor at specified times as the work progresses, according to estimates thereof as provided for, if the creditor, without the surety's consent, makes payment to the contractor in advance of its becoming payable, or without such estimate. There are authorities which hold that any payment made to the contractor in such a contract in advance of its becoming due under the terms thereof, necessarily operates to release the non-consenting surety from all liability regardless of whether the payment results to his advantage or disadvantage. That ruling is predicated on the theory that the creditor should not depart from a strict observance of the letter of the contract which the surety has guaranteed, otherwise he does so at the peril of releasing the surety from all liability. That is a very strict construction of the rule above stated for the protection of the surety, and in its application will often include cases that fall well without the very reason for the rule. We do not think that extreme doctrine is sustained by convincing reasons, or will be found supported by satisfying authorities.

There is a long line of cases, following the ruling in *Calvert* v. *London Dock Co.*, 2 Keen, 538, wherein the sureties for the faithful performance of building contracts have been held released from liability on account of payments having been made by the creditor to the contractor in advance of their becoming due under the terms of the contract. It is believed, however, that a careful examination of those cases will show that they are based on the holding that the advance payment was a plain violation of the spirit as well as the letter of the contract, being a payment that either encroached upon

the amount to be reserved until the work was fully completed free of liens or other incumbrances, or a payment so much in excess of the work performed at the time that it was clearly antagonistic and prejudicial to the rights and interests of the surety under the terms of the contract. For example: In *Calvert* v. *London Dock Co.*, supra, the contract provided that three-fourths of the work as finished should be paid for every two months and the remaining one-fourth upon the completion of the whole work. But payments exceeding three-fourths of the cost of the work were made before the completion of the entire work. In *Kiessig* v. *Allspaugh*, 91 Cal. 231, 27 Pac. 655, the contract required the owner to retain 25% of the price until the completion of the work, but it was all paid over before the work was finished. In *Glenn Co.* v. *Jones*, 146 Cal. 518, 80 Pac. 695, the contract price was $5580 payable in three installments of $1860 each, the first payment to be made when all the material was on the site. But the first payment was made when less than two-fifths of the materials was on the site, and then the contractor abandoned the work and "pocketed" the money paid. In *Welch* v. *Hubschmitt Building & Woodworking Co.* 61 N. J. L. 57, 38 Atl. 824, a part of the second payment was made before it was due and the court said: "So far as appears in the certificate, the work to be done before the second payment was earned never was done by the contractor." In *Wehrung* v. *Denham*, 42 Or. 386, 71 Pac. 133, the contract provided for payment to be made of 75% of the value of the labor performed and materials used, the balance of 25% of the total contract price to be retained until after the whole work was finished and accepted by the architect, but the contractor was paid in full as the work progressed. So in *Cowdery* v. *Hahn*, 103 Wis. 455, 81 N. W. 882, where the contract provided for payments as the work progressed of 85% of the value of the work done and materials furnished, the entire contract price was paid before the work was completed. In *James Black Masonry & Contracting Co.* v. *National Surety Co.* (Wash.) 112 Pac. 517, the contract provided for the payment of 85% of the work finished on the first day of each month and the balance on the completion of the whole work, but $3500 was paid before any work was done, $6632.46 before any material was delivered, and $9571.19 before any payment was due. In *Fidelity & Deposit Co.* v. *Agnew*, 152 Fed. 955, payments were to be made of 90% of the amount of the material delivered on the ground during the preceding month according to

the certificate of the architect, the remaining 10% to be paid 30 days after the architect accepted all the materials, etc.   The court there said:   "And when it is considered that, out of a total contract price of $110.000 . . . . . bills of some $105.000 were approved and paid . . . . and overpayment of $32,000 . . . . The prejudice of this to the surety is manifest, the overpayment made being substantially the amount above the contract price, which is now demanded."   In *Board of Com'rs* v. *Branham,* 57 Fed. 179, a payment was to be made when the work was half completed of 85% of the cost of the completed work, but not to exceed $7480, and the balance when the work was fully completed.   But a payment of $10,046.68 was made when the work was not more than one-third done, and the contractor then abandoned the work.   In *Morgan* v. *Salmon,* (N. M.) L. R. A. N. S. 1915 B. (Vol. 54) page 407, the contract provided that the obligee should retain not less than 15% of the value of all work performed and materials furnished until the complete performance of all the terms of the contract.   At the time the contractor was discharged for defective work, all work performed and materials furnished were paid for in full.   Although the foregoing are but a few of the many cases in which it is held that the surety is released because of payments to his principal, without his consent, in advance of their becoming due under the terms of the contract, yet they will suffice to show, we think, that those cases, for the most part at least, are not precedents for holding that any advance payment by the creditor to his contractor in a building contract without the surety's consent, must necessarily be held to release the surety from all liability, although it amounts to nothing more than a mere non-observance of the letter of the contract as to the time or manner of payment.

An advancement of money by an owner to his contractor before a payment becomes due under the building contract does not necessarily operate as an alteration of the contract itself.   Whether it has that effect depends, we think, upon the amount of the payment and the conditions and circumstances under which it was made, considered in connection with the rights and obligations of the surety under his contract of suretyship.   Instead of weakening the contractor's incentive to carry on the work to a prompt completion, it may strengthen his capacity to do so.   It may be found to be in effect only an advancement at the owner's risk, which is not to be

taken into account as a part of the cost of the work as against the surety in case of subsequent default of his principal. Whether in any particular case the terms of a building contract have been materially altered by advance payments to the contractor, should be determined from a consideration of the facts and circumstances, of that case.

In the quite recent case of *St. John's College* v. *Aetna Indemnity Co.*, 201 N. Y. 335, 94 N. E. 994, the owner paid the contractor, after the fifth payment and before the sixth was due, $1000 to save him from failing and to enable him to pay his men, and thereafter paid $1226.05 more to laborers to avoid labor troubles. At the time of those payments about $3000 worth of work had been performed subsequent to the fifth payment. The court there held that those payments did not release the surety from all liability. But it did hold that the payments, under the circumstances disclosed, were made at the risk of the plaintiff and that they should not be considered a part of the cost of the work to the plaintiff, as against the surety. Numerous other cases might be cited where it has been held that the surety in a building contract was released only pro tanto as the effect of advance payments to the contractor, or payments made without a strict compliance with some other provisions of the contract as to the manner of payment; and there are other cases where it is held that such payments do not release the surety at all.

In the case at bar we are of the opinion that the advance payments made by the plaintiff to the contractor, under the circumstances and conditions disclosed, did not constitute an alteration of the contract so as to release the surety from all liability. When the advances were made work in excess of the amounts had been performed. The contractor died nine days after the $5000 advance was made, and the administratrix of his estate was permitted to and did carry on the work until the plaintiff took it over under the terms of the contracts. Under these facts and circumstances it does not seem reasonable to conclude that the making of the advances had any effect to remove or diminish to any degree the contractor's incentive to complete the work. Nor do we think they affected in any way the protection of the surety against the subsequent default of its principal. Indeed it is difficult to perceive that those advancements, under the facts disclosed, concern the surety. They would have been payable to the contractor in a few days for work then performed in excess of

the amounts. It is not suggested that they encroached upon the amount reserved till the work was fully completed. The plaintiff, however, had no right to make them out of the contract price, without the surety's consent. It saw fit to make the advancements in anticipation of their subsequently becoming payable to the contractor, as any other party might have done, and in so doing it acted at its own risk.

It is not shown that the contractor used the $5000 payment in liquidation of expenses of the work. It is perhaps entirely immaterial, so far as the surety is concerned, whether it was so used or not. Certainly if it was not so used the surety is not to be held liable for it. And it is our opinion that to the extent of that payment of $5000 the surety is released. Or, what seems to be the more logical statement, the surety is not to be charged with that as a part of the cost of the work. Such a holding is in accord with the great weight of authority. And in *St. John's College* v. *Aetna Indemnity Co.*, supra, it was so held notwithstanding it affirmatively appeared that the payments were used in paying for labor employed in the work.

3. As noted above, the agreed statement shows that the plaintiff brought suit against the estate of the contractor for the damages to it resulting from his breach of the contracts and recovered judgment therein for $5950.13. Is the plaintiff estopped in this action against the surety from claiming damages in excess of that sum? That question involves the primary inquiry, whether, as between the parties to that action, that judgment is conclusive as to the amount of the damages for the breach of the contracts. The learned counsel for plaintiff in their brief, in speaking of that judgment, say: ''It must not be forgotten that it only covers the actual damages and that the auditor did not determine the amount of consequential damages and that he so expressly states in his report  .  .  .  .  so that the allowance and amount of such damages are still open for consideration.'' The plaintiff's contention, that the matter of consequential damages for the breach of the contracts is still open to it as against the estate of McHale, is not sustainable we think.

Four actions were pending between the plaintiff and the contractor's estate—two in favor of the plaintiff in this jurisdiction, and two against it in Massachusetts. The parties entered into a compromise agreement for the final disposition of all those actions. The

administratrix petitioned the Probate Court for Suffolk County, Massachusetts, for authority to carry out the agreement of compromise, stating therein how each action was to be disposed of. Among other recitals in her petition is the following: "Said railroad is to be permitted, without further opposition by this petitioner, to prove its claim in the State of Maine in the sum of $5950.13." Her petition was granted. The auditor in his report says: "Forrest Goodwin, Esq., appeared for the plaintiff, and there was no appearance for the defendant, it having been agreed between the attorney for the plaintiff and the attorney for the defendant that the auditor should find and report to the court, the actual loss or damage to the plaintiff by reason of its carrying out the contract with the defendant to be Five Thousand Nine Hundred Fifty Dollars and thirteen cents ($5,950.13), for which amount I herewith return my findings. The question of consequential damages was not considered by me." The conclusion is inevitable, that the administratrix did not agree that a judgment in the plaintiff's favor against the estate was to be entered in the suit in Maine for a part only of the damages therein sued for, and the rest of the claim for damages (amounting to $16,120) be left undetermined—a subject for further litigation. The court did not grant her authority to agree to that, and such authority, if requested, would undoubtedly have been refused. What she did agree to was that the plaintiff could prove its claim for damages against the estate for the breach of the contracts, without opposition, to the amount of $5950.13. It follows, then, as a necessary conclusion that the matter of consequential damages was not withdrawn from the plaintiff's suit against the contractor's estate for breach of the contracts, *and reserved for subsequent consideration*, with the administratrix's consent.

But the plaintiff contends that inasmuch as the auditor's report shows that he did not consider the matter of consequential damages, such damages are still open for consideration. We think not. The plaintiff's cause of action against the contractor's estate was for a breach of the contracts. For that breach but one action under each contract was maintainable, and the plaintiff was entitled therein to recover all the damages it sustained by the breach both direct and consequential. A plaintiff is not permitted to have several successive actions for one breach of a contract, simply by limiting his claim for damages in his earlier actions to less than full damages. A fortiori,

where a plaintiff has sued for all his damages for a breach of contract, he cannot be permitted to withdraw his claim for part of the damages and reserve that for the subject of another action, without the defendant's consent. *Alie* v. *Nadeau*, 93 Maine, 282, seems to be an authority directly in point on the question now being considered. There the plaintiff had a contract with the defendant for six months employment at weekly wages. He was discharged within the period and brought suit for his wages unpaid up to the date of his writ and recovered. After the expiration of the six months he brought another action for wages from the date of his first writ. It was held that there was but one breach of the contract, for which but one action could be maintained, in which the plaintiff would be entitled to recover all his damages sustained by the breach, both present and prospective; and that he was not entitled to recover in the second action, notwithstanding he had not included in his first action the damages claimed in the second. He should have done so, and accordingly the law presumes that he did allege and recover in that action all the damages that he sustained. In the case at bar the plaintiff brought suit against the estate of the contractor, and alleged therein all the damages which it then claimed or now claims resulted to it from the breach of the contracts. It was entitled to make proof in that action of all its damages, and having taken judgment therein that judgment must be presumed to represent all the damages it sustained.

That judgment, however, is not a bar to this action against the surety, because it has not been satisfied. But is it not an adjudication as to the amount of the damages that the plaintiff sustained by the contractor's breach of the contracts, which the plaintiff is not permitted to question in this action against the surety for the same breach? That the surety may question it we have no doubt, but we are constrained to the opinion that the plaintiff cannot be permitted in this action to do so. The case, *United States* v. *Allsbury*, 4 Wallace, 186, is directly in point. Allsbury had become bound as a surety on the official bond of one Dashiel, paymaster. Suit was brought against Dashiel and one of his sureties, but not Allsbury, to recover $20,085 as damages, and judgment was rendered therein for $10,318.22. While proceedings were pending to have that judgment reversed on writ of error, an action on the same official bond was brought against the personal representatives of Allsbury, and the

former judgment was pleaded and admitted for the purpose of reducing the recovery to that amount. The Supreme Court, in an opinion by Mr. Justice Nelson, said: "It is unnecessary to refer to authorities to show that the liability of the surety cannot exceed that of his principal; and that amount having been fixed by a judgment at law, it formed the rule to determine the sum to be recovered in this suit. The verdict and judgment were competent evidence on behalf of the surety for this purpose; indeed, the highest evidence of the fact. Other questions would have arisen if this judgment had been offered against the surety."

In the case at bar the plaintiff saw fit to have the question of the damages it sustained by the breach of the contracts, for the performance of which the surety was bound, determined in an action against the contractor in a court having jurisdiction to determine that question. We think the judgment recovered in that action fixes the amount of the damages for the breach of the contracts, so far as the plaintiff's rights are concerned.

Under the terms of the grading contract the plaintiff had the right to take possession of "the tools, materials, plant, appliances, houses, machinery, and other appurtenances thereon, and hold the same as security for any and all damages or liabilities that may arise by reason of the nonfullfilment of this contract within the time herein stipulated." The plaintiff having taken possession of the contractor's plant in the exercise of its right under the contract held the property so taken, for the benefit of the surety as well as itself, as security for any damage it sustained by reason of the contractor's breach of the contracts. *Springer v. Toothaker*, 43 Maine, 381. And notwithstanding the action of trover against the plaintiff for the value of the property so taken, and its settlement of that action by payment to the contractor's estate of $7299.50, which was done without the surety's consent, it must still be regarded, so far as the surety is concerned, as holding the plant and property as security.

The foregoing conclusions of the court may be summarized thus: (1) that the defendant has not been released from all its liability as surety under the bonds in suit; (2) that the payment of August 25, 1909, does not form a part of the damages for the breach of the contracts, so far as the defendant is concerned; (3) that the judgment recovered in the plaintiff's action against the contractor's estate for

breach of the contracts fixes the amount of the damages for such breach so far as the plaintiff is concerned, and the matter of consequential damages is not now open for consideration; (4) that the plaintiff holds the plant and other property of the contractor which it took possession of under the terms of the contract, as security for the damages it may be entitled to recover against this defendant in these actions, the value of that plant and property to be fairly and impartially ascertained and so applied.

The cases will, therefore, be remanded to nisi prius to be disposed of in accordance with the stipulation and this opinion.

*So ordered.*